No. 16,364.

PEOPLE EX REL. *v.* HEALD.
(229 P. [2d] 665)

Decided April 2, 1951.

Mr. JOHN W. METZGER, Attorney General, Mr. ALLEN MOORE, Deputy, Mr. ROBERT BUGDANOWITZ, Assistant, Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. FRANK A. WACHOB, Assistant, Mr. JAMES D. PARRIOTT, JR., Assistant, for complainant.

Mr. ISAAC MELLMAN, for respondent.

*En Banc.*

MR. JUSTICE HAYS delivered the opinion of the court.

RESPONDENT, a duly licensed attorney, was indicted, tried and convicted in the United States District Court for Colorado on two separate offenses against the laws of the United States, in cases Numbers 3791 and 3872 on the docket of said court, for making, and causing to be made, to a governmental lending agency false statements, and also of conspiring to do the same. His conviction was affirmed by the United States Court of Appeals, *Heald v. United States,* 175 F. (2d) 878, 177 F.

(2d) 781, and certiorari denied by United States Supreme Court, *Heald v. United States,* 338 U. S. 859, 70 S. Ct. 101, 94 L. Ed. 526.

Thereafter, original disbarment proceedings were instituted in this court by the attorney general based upon the above convictions, and in accordance with the procedure announced in *People ex rel. v. Laska,* 101 Colo. 221, 72 P. (2d) 693, the cause was referred to the Honorable Edward C. Day, one of the judges of the district court of the City and County of Denver, as referee, for examination, trial and findings. At the conclusion of the trial of the issues raised by the pleadings, the referee made a lengthy report, in which he specifically found that respondent was fairly tried and properly convicted upon sufficient evidence in the federal court, and that the offenses with which he was charged and convicted involved moral turpitude.

We are urged to disapprove the report of the referee chiefly upon the ground that the charges against respondent did not involve moral turpitude.

In relation to the question as to whether or not the crime charged involved moral turpitude, it is proper to consider the following excerpt from the opinion of the United States Circuit Court of Appeals in *Heald v. United States,* 175 F. (2d) 878:

"E. Clifford Heald and Louise B. Heald are husband and wife, and Bradley Heald is their son. E. Clifford Heald is a lawyer. Bradley Heald was the builder and seller of some 40 houses known as the Heald project. Louise B. Heald was the sales agent of the houses, on commission, and executed as broker one of the sales contracts pertaining to the house in question. E. Clifford Heald, along with one Ginsberg owned the lots on which the houses were built and these two from time to time deeded the houses to Bradley Heald so as to enable him to execute deeds to persons.

"By letter to the Veterans Administration dated February 20, 1947, Bradley Heald requested an appraisal of

the 40 houses in the Heald Project, the letter stating that the houses were being constructed under Priorities Regulation .33 for preferential sale to veterans. The houses were all appraised by the Veterans Administration on March 17, 1947, and the reasonable value of each was appraised at $10,600 by the official appraisers. The Healds were notified of this appraisal April 4, 1947.

"Pursuant to an advertisement in a local paper offering these houses for sale, John C. Hess, a veteran, contacted Louise B. Heald on June 12, 1947, and asked her if the houses would take a G. I. loan. He received an affirmative reply. She represented the sale price to be $11,500 and Hess immediately gave her a check for $500 as a down payment and arranged to see E. Clifford Heald the next day to complete the deal. On June 13, 1947, Hess went to the office of E. Clifford Heald where a receipt and option agreement, prepared prior to his arrival, calling for a consideration of $11,500 was signed by Hess and E. Clifford Heald. The contract recited that the option was to be exercised provided the buyers could obtain a loan for $9,600. It was signed, 'Heald Investment Company, Broker, by E. C. Heald.' Hess testified that he signed several other documents at the same time which E. Clifford Heald advised him were copies of the $11,500 contract. It developed, however, that on this occasion Hess actually had signed another and different contract bearing the date of June 14, 1947, calling for a purchase price of $10,600. This contract was signed by Louise B. Heald. Although this contract bore Hess' signature, he testified that he had never seen it until before the grand jury and that he did not know that he had signed it; that it was not a copy of the contract he signed; and that at no time had the sum of $10,600 been discussed with E. Clifford Heald as a purchase price of the premises. He further testified that on June 26, 1947, he went to the Investment Company's office and gave E. Clifford Heald a cashier's check in the amount of $900 in the presence of Bradley Heald. Also, on June 26, 1947,

E. Clifford Heald took the $10,600 contract to the Silver State Savings and Loan Association and closed the transaction. The Loan Closing Sheet, prepared by Bradley Heald, indicated the sale price of the houses to be $10,600. A loan of $9,600 was made to Hess and his wife, four thousand of which was guaranteed by the Veterans Administration. The warranty deed executed by Bradley Heald to Hess and his wife bore cancelled revenue stamps in the total sum of $12.75, which, translated into selling price, indicated a consideration of $11,500. Otis A. King, President of the Silver State Savings and Loan Company, testified that E. Clifford Heald came to the office prior to the date of the closing of the transaction and left an agreement calling for a consideration of $11,500 and that King called him over the 'phone and told him that he knew that a transaction like this could not go through the office; that he was incensed over him bringing such a transaction to his office and informed him that he couldn't honor or countenance a deal of that kind; that he returned the $11,500 contract to Heald; that a few days later Heald called him and said that they had decided to sell the property for $10,600. He further testified that at the time of the closing of the transaction, the warranty deed was prepared before it was brought to his office and that the Healds provided and placed the revenue stamps thereon.

"The evidence thus disclosed that all the Healds knew the actual selling price to Hess was $11,500; they also knew that the house could not take a G. I. loan if sold for more than $10,600; they all knew that such a loan was necessary or there could be no sale. Finally, they all had some part to play in the transaction with the Loan Association in which the representation was made that the sale was for $10,600. E. Clifford Heald performed the slight of hand trick with the two contracts, the false one of the two having been executed, 'Heald Investment Company by Louise B. Heald,' and the other, 'Heald Investment Company by E. C. Heald.' Bradley

Heald executed the Loan Closing Statement reciting the false consideration. Thus all three from this evidence, if believed by the jury as it was, had a part to play in the scheme to defraud."

We are convinced that the offenses of which respondent was convicted involved moral turpitude. *In Re Finch*, 156 Wash. 609, 287 Pac. 677; *Jacobs v. State Bar of California*, 219 Cal. 59, 25 P. (2d) 401; *In Re Hatch*, 10 Cal. (2d) 147, 73 P. (2d) 885; *In Re Hopkins*, 54 Wash. 569, 103 Pac. 805; *Marsh v. State Bar of California*, 210 Cal. 303, 291 Pac. 583.

The findings of the referee are fully supported by the evidence; they accordingly are adopted and approved; and respondent, E. Clifford Heald, is hereby suspended from the practice of the law in the State of Colorado for a period of six months, beginning March 29, 1951.