[L.A. No. 30408. In Bank. June 2, 1975.]

MILTON A. PHILLIPS, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Saul J. Bernard and Bonnie J. Barr for Petitioner.

Herbert M. Rosenthal and Stuart A. Forsyth for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California (board) that petitioner be suspended from the practice of law for three years on conditions of probation, including actual suspension for the first eighteen months.

Petitioner was admitted to practice in 1962. In 1974 he was publicly reproved for failure to pay the medical creditors of five of his clients from the proceeds of the settlements of personal injury actions in their behalf. Such prior discipline was not considered by the board in this proceeding, because the board's action with respect thereto had not become final at the time the board made its findings of fact and recommendation for discipline herein. Such action has now become final, however, and may properly be considered by this court.

In August 1967 Donald Spector retained petitioner to represent him in a claim for personal injuries allegedly sustained in an automobile accident a few days earlier.[1] Mr. Spector signed one of petitioner's standard retainer forms, which provided, among other things, "The client hereby empowers the attorney to perform the said services for and on behalf of the client, and in his or her name, and to do all things which the attorney may deem necessary, appropriate or advisable."

The accident involved an uninsured motorist, and petitioner pursued Mr. Spector's remedies against the latter's insurer, Liberty Mutual Insurance Company (Liberty Mutual). Eventually the matter was submitted to arbitration, the hearing being held on January 13, 1969. On February 3, 1969, the arbitrator awarded Mr. Spector $1,344.50 as general and special damages, together with $50 as the administrative fee of the American Arbitration Association. Both petitioner and Mr. Spector had anticipated a substantially larger award, but petitioner in the end concluded that the ruling may have been justified.

On February 6, 1969, counsel for Liberty Mutual sent petitioner a release and trust agreement for execution by Mr. Spector and notified petitioner that upon receipt of an executed copy he would obtain a draft from Liberty Mutual in the amount of the arbitrator's award, made payable to Mr. Spector and to petitioner as his attorney. Under the

---

[1]Mr. Spector was hospitalized and was treated for a kidney condition. He apparently believed that the condition resulted from the accident, but the evidence in this respect was inconclusive. Mr. Spector also testified that as a result of the accident he had a recurrent back ailment.

release and trust agreement Mr. Spector would have been required to acknowledge that there had been a complete settlement of the liability claimed. On the reverse side was a form for him to sign to the effect that it was his intention to discharge all rights and claims for damages "even though some of such damages may not have shown themselves at the time of the acceptance of [the] settlement."

Petitioner wrote Mr. Spector on February 20, 1969, requesting that he call and make an appointment to come to petitioner's office to sign the document. According to Mr. Spector, he telephoned petitioner and told him that he would not settle the case, as he considered the arbitrator's award very unfair. Petitioner explained to Mr. Spector that the award was final and was not appealable and that they would have to accept it. Mr. Spector nevertheless persisted in his refusal to sign the document.

On March 31, 1969, counsel for Liberty Mutual wrote petitioner a follow-up letter. On it appears a notation dated April 1, 1969 (apparently made by petitioner) indicating that counsel's secretary had been informed that Mr. Spector refused to sign the document. The next day petitioner wrote Mr. Spector again, advising him that they were required to abide by the arbitrator's ruling and requesting that he telephone for an appointment to come to petitioner's office to discuss the matter. Apparently Mr. Spector telephoned petitioner's office in response to the letter, but he still refused to sign the document. At the hearing before the local administrative committee he testified that he never changed his mind about signing a release.

According to petitioner's testimony, counsel for Liberty Mutual called him several times during 1970, indicating a desire to close his file. On February 13, 1970, petitioner signed the document on both the front side (containing the release and trust agreement) and on the back (containing the supplemental statement of intent to release unknown claims). In each instance he signed, "Donald Spector (by M. A. Phillips)." He therefore purported to release Liberty Mutual from all claims which Mr. Spector might ever have against it as a result of the accident. It is clear that although the award was a final one and not appealable, Mr. Spector had never expressly authorized petitioner to sign a release on his behalf. Petitioner claims, however, that the provision hereinabove quoted from his retainer agreement authorized him to do so.

According to petitioner, he wrote Mr. Spector on February 3, 1970, 10 days before executing the release, stating that if he did not hear from Mr. Spector immediately, he would, under the authority of the provision of

the retainer agreement hereinabove quoted, execute the release and trust agreement, as well as the settlement draft, for Mr. Spector in his behalf and would hold the proceeds of the draft for him until he was ready to cooperate with petitioner's office. Mr. Spector testified that he never received the letter and that petitioner had never informed him that under the terms of the retainer agreement he could and would sign Mr. Spector's name to the release and the settlement check if the latter did not do so. Although petitioner knew Mr. Spector's address on February 3, 1970 (18842 Malden Street), the letter he claims to have sent Mr. Spector at that time shows a different address (1882 Malden Street), but the original was not returned to petitioner by the post office.

On February 25, 1970, counsel for Liberty Mutual sent petitioner a draft for the full amount due under the arbitration award. The draft was made payable to the order of "Donald Spector and Milton A. Phillips, Esq." Petitioner did not notify Mr. Spector in writing that he had received the draft, but he testified that he *may* have tried to notify him by telephone but had no independent recollection of having done so.

Although the record does not show at what time he did so, petitioner admittedly endorsed the draft, "Donald Spector by Milton A. Phillips Milton A. Phillips." Petitioner testified that he was unable to find his records for the period in question and therefore could not produce a deposit slip showing that it had been deposited to his trust account, but that he had every reason to believe that it was so deposited.

Liberty Mutual commenced a subrogation proceeding against the uninsured motorist involved in the accident, and a court hearing was held in May 1972. Mr. Spector was subpenaed as a witness and, to his astonishment, was shown the draft with the endorsement on the back. The judge asked him if the signature was his and, upon receiving a negative reply, apparently referred the matter to the State Bar.

On May 19, 1972, a representative of the State Bar wrote to petitioner, asking him to give a written explanation of the details surrounding the transaction. Petitioner dictated to his secretary, Marlene Block, a letter to Mr. Spector, instructing her to backdate it to January 15, 1970, destroy the original, make a photocopy of the carbon copy, and send the photocopy to the State Bar with a covering letter, which he began dictating to her. Petitioner was then interrupted by a telephone call. When he was later going to resume dictating, Mrs. Block questioned him about the matter. After he explained the background, she indicated that she thought it was unethical and perhaps illegal for him to send the State

Bar a letter he was writing at that time but representing to have been written two years earlier. Petitioner was again interrupted, this time by some clients coming in to see him. Mrs. Block then asked an attorney whose office was nearby if he thought it was all right for her to write a letter and backdate it, and he advised her not to do it.

A few days later petitioner spoke with Mrs. Block about the matter again, requesting that she type the letters, but she refused, saying that she did not want to be involved. Shortly after that, she married and took a few days off from work for her honeymoon. Upon her return, she told petitioner that she would be leaving his employ within a week. When she finally left, she took with her the stenographer's notebook in which she had written petitioner's dictation regarding the matter. The idea of taking the book with her was her own, and she did not ask petitioner's permission.

Some time after Mrs. Block left, petitioner sent a letter to the State Bar, dated June 22, 1972, reading:

"Please forgive the delay in responding to your letter of May 19, 1972 as I have been without proper secretarial help due to the resignation of my secretary.

"Mr. Spector's claim was adjudicated before the American Arbitration Tribunal and an award was made by the Arbitrator on February 3, 1969. Thereafter, I wrote to Mr. Spector on several occasions advising him to come into the office and sign the settlement releases. Mr. Spector failed to reply to all of my letters. I wrote to him and advised him that pursuant to our Retainer Agreement, and more particularly Paragraph 2 thereof, I was empowered 'to do all things which I may deem necessary, appropriate, or advisable' for the client.

"Thereafter, I signed the Settlement Release 'Donald Spector by Milton A. Phillips' and returned the Release to the carrier. They accepted the release signed in this manner and issued their draft in accordance with the Arbitrator's award. I likewise signed the draft 'Donald Spector by Milton A. Phillips' and deposited the draft in my trust account where the proceeds still remain.

"If you will have Mr. Spector contact me, I will make all appropriate disbursements. Thank you for your courtesy and cooperation in assisting me in bringing this matter to a conclusion. I trust that the above explanation will be deemed satisfactory."

About 10 days later petitioner wrote the State Bar again, enclosing copies of letters allegedly written to Mr. Spector on February 20, 1969, March 2, 1969, and February 3, 1970, indicating that he was doing so in accordance with a telephone conversation with the State Bar's representative. The February 3, 1970, letter differed in language from the letter he had dictated to Mrs. Block, but the substance was almost identical.

Petitioner claims that he had intended, while dictating to Mrs. Block, to make it clear in his letter to the State Bar that the copy of the letter he was enclosing purportedly written to Mr. Spector in 1970 was not a copy of the actual letter he had sent, but contained the *substance* of a letter he had sent. He testified that had he been able to resume the dictation to Mrs. Block, he would have made it clear. He also said, however, that by the time he wrote to the State Bar in late June, he had retrieved the Spector file, which had been put away as a "dead file," and was able to send a copy of the actual letter sent to Mr. Spector.

The initials of the secretary who typed the June 22, 1972, letter to the State Bar and the letter dated February 3, 1970, allegedly sent to Mr. Spector were the same ("em"). Petitioner said that it is possible that he employed the same person at both times but that he thought that the fact that the same initials appeared was merely a coincidence. Additionally, his file in the Spector matter did not include a tissue or carbon copy of the alleged letter of February 3, 1970.

When petitioner wrote to the State Bar on June 22, 1972, and on July 3, 1972, he did not mention any difficulty in locating his file or any of the papers which should have been in it. Mrs. Block testified that when petitioner was dictating the proposed letter to her, he had a file before him, and that she assumed it was the Spector file.

Petitioner testified that in the middle of 1972 he did not have Mr. Spector's current telephone number or address,[2] but that he was finally able to obtain such information from the attorneys who represented Liberty Mutual in the subrogation proceeding and that he then contacted Mr. Spector and arranged for him to come in to the office on September 12 or 13, 1972, to receive his share of the proceeds. He said that at all times after he received the draft he had been ready, willing, and able to give Mr. Spector the portion of the proceeds to which he' was entitled and that the reason he had not done so was that he was waiting for Mr.

---

[2]Mr. Spector testified that he had moved several times during the period in question, but that his wife always telephoned petitioner's office and left the new forwarding address.

Spector to come in to the office, so that he could sign a disbursement sheet, on which all of petitioner's expenditures and the amount of his fee were shown. He said that in his office it was standard practice to wait until a client had signed such a disbursement sheet before turning over to him his share of the proceeds of any settlement. Mr. Spector testified, however, that he did not learn of petitioner's receipt of the draft until almost two and a half years after petitioner received it.

At the time Mrs. Block worked for petitioner she had a health problem, in that she had a small skull tumor, which was subsequently removed; and during the time she was working for petitioner she was under sedation. Petitioner seeks to attack her credibility because of this fact. However, her testimony is corroborated by the shorthand notes contained in the stenographer's notebook which she turned over to the State Bar, as well as the testimony of the attorney whom she consulted after petitioner asked her to backdate the letter.

■ This court has pointed out on innumerable occasions that the burden is on the petitioner to show that the board's findings are not supported by the evidence. (See, e.g., *Brody* v. *State Bar,* 11 Cal.3d 347, 350 (3) [113 Cal.Rptr. 371, 521 P.2d 107]; *Emslie* v. *State Bar,* 11 Cal.3d 210, 219 (2) [113 Cal.Rptr. 175, 520 P.2d 991].) Petitioner, however, has failed to meet this burden.

Petitioner testified in person before the local administrative committee, and his own credibility was therefore in issue. The local administrative committee, after hearing him and all the other witnesses testify, resolved the conflicts against petitioner and specifically found, among other things, that he never sent Mr. Spector any such letter as that dated February 3, 1970, and that in an attempt to deceive the State Bar he had knowingly and falsely represented to the State Bar that he did. The local administrative committee also found that petitioner wilfully failed to advise Mr. Spector promptly of the receipt of the settlement proceeds; that Mr. Spector had no knowledge of petitioner's receipt of the draft; and that petitioner failed, until after the State Bar contacted him in 1972, more than two years following his receipt of the proceeds of the draft, to disburse to Mr. Spector his share thereof. These findings were appropriately adopted by the board.

■ Although this court is not bound by the findings of either the local administrative committee or the board, such findings are entitled to great weight; and where the credibility of witnesses is in issue, the findings of the local administrative committee are particularly signifi-

cant. (*Emslie* v. *State Bar, supra,* 11 Cal.3d 210, 220 [113 Cal.Rptr. 175, 520 P.2d 991].)

■ It is clear from the record that petitioner wilfully failed to report promptly to Mr. Spector the fact that he had received the draft from Liberty Mutual.[3] Accordingly, petitioner has violated rule 9 of the Rules of Professional Conduct, which provides in pertinent part: "A member of the State Bar . . . shall promptly report to the client the receipt by him of all money and other property belonging to such client."

Petitioner's conduct in attempting to deceive the State Bar by falsifying a letter allegedly sent to Mr. Spector is reprehensible, necessarily involves moral turpitude, and warrants discipline. (Bus. & Prof. Code, § 6106; *Barreiro* v. *State Bar,* 2 Cal.3d 912, 926 [88 Cal.Rptr. 192, 471 P.2d 992]; *Mack* v. *State Bar,* 2 Cal.3d 440, 445 [85 Cal.Rptr. 625, 467 P.2d 225]; *Reznik* v. *State Bar,* 1 Cal.3d 198, 203-204 [81 Cal.Rptr. 769, 460 P.2d 969, 40 A.L.R.3d 161].)

Although the discipline formerly meted out to petitioner was only public reproval, it is significant that the actions for which he was then disciplined involved a failure to pay certain clients' medical obligations from the settlements received by petitioner on their behalf.

The local administrative committee recommended that petitioner be suspended for two years, with actual suspension for one year. The board, as hereinabove indicated, recommended three years' suspension on conditions of probation, including actual suspension for the first eighteen months. ■ Although ordinarily the recommendation of the board with respect to the discipline to be imposed is given greater weight than the recommendation of the local administrative committee, the final word rests with this court (*Toll* v. *State Bar,* 12 Cal.3d 824, 831 (2) [117 Cal.Rptr. 427, 528 P.2d 35]; and under the circumstances here shown we have concluded that, even giving consideration to the prior discipline imposed upon petitioner (see *Mack* v. *State Bar, supra,* 2 Cal.3d 440, 447), the discipline recommended by the local administrative committee is the more appropriate discipline to be imposed.

■ It is ordered that petitioner be suspended from the practice of law for two years. Execution of such suspension is stayed, and petitioner

---

[3]The letter of February 3, 1970, incidentally, was supposedly written *before* petitioner received the proceeds of the draft. Petitioner testified that he may possibly have advised Mr. Spector by telephone that he had actually received the draft, but he could not say for certain that he had done so; and he said that he did not know "if it was important or not important" to write Mr. Spector any further letters after February 3, 1970.

is placed on probation for the two-year period upon condition that for the first year he shall be suspended from the practice of law and that he comply with the conditions set forth in the "Findings of Fact and Recommendation Adopted by the Disciplinary Board" (Disciplinary Board Minutes, Oct. 10 and 12, 1974), except that the period of suspension shall be as hereinabove set forth, which conditions are hereby adopted as part of the order of this court. It is further ordered that within 30 days after the effective date of this order petitioner shall perform the acts specified in rule 955, subdivision (a), California Rules of Court, and that within 40 days after the effective date of this order petitioner shall file with the clerk of this court, with proof of service of a copy on the State Bar at its San Francisco office, an affidavit containing the matters specified in subdivision (c) of the foregoing rule. This order is effective 30 days after the filing of this opinion.