### No. 27887

**The People of the State of Colorado v. Stephen T. Susman**

(587 P.2d 782)

Decided November 13, 1978.

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, Edward G. Donovan, Solicitor General, Felip V. Ponce, Assistant, for complainant.

Anthony F. Zarlengo; Geer & Goodwin, P.C., Edward O. Geer, for attorney-respondent.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

The Attorney General filed a formal complaint against the respondent, Stephen T. Susman, alleging that he engaged in conduct which violated Rule 241(B), C.R.C.P. The two counts in the complaint charged violations of the Code of Professional Responsibility and asserted that the respondent had neglected legal matters entrusted to him. DR6-101(A)(3).

As a result of the hearing on the complaint, additional charges were before the Grievance Committee of this court relating to a violation of DR1-102(A), which provides, in pertinent part, that a lawyer shall not:

"(3) . . . engage in illegal conduct involving moral turpitute.

"(4) . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) . . . engage in conduct that is prejudicial to the administration of justice, or

"(6) . . . engage in . . . other conduct that adversely reflects on his fitness to practice law."

At the conclusion of the hearing, the Grievance Committee of this court submitted findings of fact, conclusions, and recommendations. The recommendation of the Grievance Committee is that the respondent be disbarred and that he be assessed the costs of these proceedings and be permitted to apply for reinstatement at such time as he is able to present evidence of his rehabilitation. We have concluded, for the reasons set forth in this opinion, that the sanction which should be imposed is that the respondent be suspended for a period of six months, after which he may apply for reinstatement upon a showing of rehabilitation.

Stephen T. Susman was admitted to practice law in the State of Colorado on December 9, 1960, and has been engaged in the private practice of law in Colorado since that time. In the course of his practice, he had been previously admonished for neglecting legal matters entrusted to him, in violation of Canon 6 of the Code of Professional Responsibility. DR6-101(A)(3) provides:

"DR6-101 *Failing to Act Competently.*

"(A) A lawyer shall not:

. . . . .

"(3) Neglect a legal matter entrusted to him."

The initial complaints were primarily directed at conduct which showed respondent's neglect and failure to complete legal services within a reasonable period of time. The more serious transgression, which came about in the course of the Grievance Committee hearings on the DR6-

101(A)(3) charges of neglect consisted of giving false testimony. The following findings of fact and conclusions were made by the Grievance Committee of this Court:

## I.

### The Berger Matters

■ In December of 1973, Merrill Berger, Jr. employed the respondent to make a claim against his insurance company. The claim carried with it a one-year statute of limitations. The respondent failed to file suit within a year. Another lawyer pursued the claim and lost the suit on the merits and not on the basis of limitations. For that reason, no damages were suffered by the respondent's client on the insurance claim. The respondent acknowledged, in the course of the hearing, that he was neglectful in not filing the case in a timely fashion.

In 1974, respondent was employed by Berger to institute a conservatorship for Berger's father, who was incapacitated. Berger desired to have a conservator appointed for his father's estate at the earliest possible time, so that he could obtain funds to pay his father's bills. When the respondent failed to obtain the conservatorship, Berger retained another lawyer in 1975, who opened a conservatorship estate. Further delays occurred in the opening of the estate by reasons of the fact that Berger's new counsel had some difficulty in obtaining the necessary files from the respondent.

## II.

### The Kerr Matter

■ Ernest H. Kerr died on August 23, 1969. Approximately five days later, the respondent was retained to handle the estate. He was directed to prepare an inheritance tax application and such documents as were necessary to transfer title of the family home to Kerr's widow and daughter in joint tenancy.

In September 1971, John Kerr, a son of the decedent, contacted the respondent and advised him that the real estate tax notices relating to the residential property reflected that the property was still owned by the decedent, Ernest Kerr, and his wife, as joint tenants. Within a few days thereafter, the respondent took a blank inheritance tax application to Mrs. Kerr's home and had her sign it. He then returned to his office and had the blank inheritance tax form notarized by his secretary with a date of September 27, 1971.

In September 1972, John Kerr again contacted the respondent because nothing had been done, and a new tax notice disclosed that the property was still in the name of the late Ernest Kerr and his wife. The respondent assured John Kerr that everything was being taken care of, and finally, in November of 1972, he mistakenly prepared a deed conveying sole ownership of the Kerr family home to the daughter, had the deed signed by the widow, and caused it to be recorded. It was not until July of 1973 that a proper deed was finally prepared by the respondent, executed,

and recorded conveying the property to the widow and the daughter as joint tenants.

In 1974, a granddaughter of the decedent contacted the respondent and learned that at that time the inheritance tax application still had not been filed. After a complaint was filed with the Grievance Committee, the application was finally filed. It is clear from the record that the Kerr estate was a simple, non-taxable estate and that no problems existed which would have warranted any delay in the filing of the inheritance tax application.

The handling of both the Kerr estate and the Berger legal matters constituted violations of DR6-101(A)(3). However, the two matters of neglect are not of monumental significance when compared to the defendant's grievous wrong in offering false testimony to the Grievance Committee in an effort to mislead the commission and justify his neglegent handling of the Kerr estate.

Respondent contended, although given an opportunity to correct his testimony on several occasions, that he had Ernest Kerr's widow sign a blank inheritance tax application on September 27, 1971, and that he filled in the form to the extent possible on the same day. He said that his secretary notarized the widow's signature on the day that it was signed. He said that the reason that the inheritance tax application was not completed on that day was that there was one bill relating to the decedent which had not been submitted. He claimed that the completed inheritance tax application was in the file when John Kerr came to his office in 1972 and again in 1973 and that he showed the file to John Kerr on each occasion.

He also testified that the decedent's granddaughter told him that she had prepared and filed an inheritance tax application in 1971. For that reason, he stated that he did not file the application until he learned in April of 1975 that no application had been filed and that the family expected him to complete the filing.

The testimony relating to the procedure which was followed in the preparation and handling of the inheritance tax application was presented on August 25, 1976. At that time, the respondent repeatedly said that the application was completed and was ready for filing on September 27, 1971, or shortly thereafter. At the conclusion of the hearing, the Committee advised the respondent that there were certain concerns and several puzzling aspects to the case which the Committee desired to explore.

The case was not closed, but was referred to the Colorado Bureau of Investigation. A questioned documents examiner, in examining the inheritance tax application, discoverd that an IBM Prestige Pica 72-10 Pitch Typewriter Ball ("Prestige Pica 72") was used to type both the inheritance tax application, which respondent claimed was typed on September 27, 1971, and the accompanying letter of transmittal, which was mailed,

with the application, on July 9, 1975. IBM did not make the Prestige Pica 72 available for public use until March 15, 1972. The typewriting on the inheritance tax application and the typewriting on the letter of transmittal, which the respondent claims was written 45 months after the inheritance tax application was prepared, were identical. When the respondent was confronted with the expert's testimony, he claimed, for the first time, that he may have had two inheritance tax applications signed in blank and notarized. He then stated that when he did submit the final return, he may have had the inheritance tax application retyped for one reason or another before it was filed.

In offering the explanation, which the Grievance Committee rejected, the respondent made a serious situation worse. The Grievance Committee found and concluded that the respondent repeatedly and deliberately testified falsely before the hearing committee, ignoring his oath as a witness, his oath as an attorney, and his obligation to adhere to the standards of honesty and integrity which must exist if our system of justice is to function.

### III.
### *Conclusions*

At no time has the respondent admitted that he testified falsely, expressed regret for testifying falsely, or suggested any type of incapacity as an explanation for his false testimony. He is now undergoing psychotherapy. His counsel has requested, on his behalf, that we permit him to continue to practice law under the supervision of a group of prominent lawyers, with the assurance of the psychiatrist that he is no threat to the public and is capable of carrying out his obligations as an attorney. This we are not prepared to do.

The evidence in the record before us supports the finding that the respondent knowingly gave false testimony, and for that reason, the findings of the Grievance Committee will not be disturbed on review by this court. *See People v. Yoakum,* 191 Colo. 269, 552 P.2d 291 (1976); *In re Fahey,* 106 Cal.Rptr. 313, 505 P.2d 1369 (1973). The respondent's actions in this case are similar to those which we condemned in *People v. Klein,* 179 Colo. 408, 500 P.2d 1181 (1972); *see also People v. Heald,* 123 Colo. 390, 229 P.2d 665 (1951). In our view, the respondent's misconduct goes to the foundation of our justice system and warrants the most severe punishment. *People v. Yoakum, supra; Melville v. Wettengel,* 98 Colo. 529, 57 P.2d 699 (1936); *Phillips v. State Bar,* 121 Cal. Rptr. 605, 535 P.2d 733 (1975); *Nebraska State Bar v. Cook,* 194 Neb. 364, 232 N.W.2d 120 (1975).

Determining the sanction which should be imposed in this case is difficult. The Grievance Committee has recommended that the respondent be disbarred and at the same time be granted the right to apply for reinstatement at such time as he is able to present evidence of

rehabilitation. Disbarment, in our view, constitutes legal death, and for that reason, the recommendation of disbarment is inconsistent with the right to apply for reinstatement at any time that the respondent can present evidence of rehabilitation. *A.B.A. Standards for Lawyer Disciplinary and Disability Proceedings* § 6.2.[1]

We said, in *People v. Klein, supra*:

"Some of the members of this Court, including the author of this opinion, originally favored disbarment of the respondent. However, in examining the case law in this state we find that we are told that 'where there is a comparable case it should be resorted to for guidance in order that uniformity in the administration of justice be achieved as nearly as possible.' Colorado cases with analogous situations have resulted in the sanction of suspension. *See, e.g.,* 123 Colo. 390, 229 P.2d 665."

Thus, it would appear that suspension, rather than disbarment, is the proper sanction. In *Klein*, we imposed a three-year barrier against reinstatement. Here, we have concluded that the respondent should be eligible for possible reinstatement at an earlier time. *Standard, supra,* § 6.4.[2] Hopefully, the criteria and standards which we have set out in this case will be of assistance to the Grievance Committee in future cases in determining the proper sanction for violation of professional responsibility.

█ This court has, as part of its inherent powers, the ultimate and exclusive responsibility for the structure and administration of disciplinary proceedings against lawyers. Each individual case must be determined on the basis of the facts in that case and the standards for discipline which have been established by this court. *People v. Radinsky,* 176 Colo. 357, 359-360, 490 P.2d 951, 952 (1971); *Standards, supra,* § 2.1.[3]

█ The report and recommendation of the Grievance Committee is advisory. *In re Espedal,* 82 Wash.2d 834, 514 P.2d 518, 520 (1973). This

---

[1] *6.2 Disbarment — Readmission.* The court has exclusive power to readmit a disbarred lawyer. "The lawyer should not be able to apply for readmission until at least five years after the effective date of disbarment and should not be readmitted unless he can show by clear and convincing evidence: rehabilitation, fitness to practice, competence and compliance with all applicable discipline or disability orders and rules."

[2] "*6.4 Suspension — As Final Discipline — Reinstatement.* The court has the exclusive power to reinstate a suspended lawyer.

"A lawyer who has been suspended for six months or less should be reinstated automatically upon expiration of the period of suspension and the filing of an affidavit that he has complied with all applicable discipline or disability orders and rules.

"A lawyer who has been suspended for more than six months should not be reinstated automatically upon expiration of the period of suspension. The lawyer should not be able to apply for reinstatement before expiration of the period of suspension and should not be reinstated unless he can show by clear and convincing evidence: rehabilitation, compliance with all applicable discipline or disability orders and rules, fitness to practice and competence."

[3] "*2.1 Responsibility of State's Highest Court.* Ultimate and exclusive responsibility within a state for the structure and administration of the lawyer discipline and disability system and the disposition of individual cases is within the inherent power of the highest court of the state."

court has the duty to review the recommendations and to increase or decrease the sanction imposed by the Committee in a proper case. *Bradpiece v. State Bar,* 111 Cal.Rptr. 905, 518 P.2d 337, 340 (1974); *In the Matter of Krogh,* 85 Wash.2d 462, 536 P.2d 578 (1975): *Standards, supra,* Comment to § 8.48.[4]

It is, of course, necessary that we review all cases involving professional discipline in light of the facts, circumstances, and background of the individual lawyer.

We impose a minimum suspension of six months. The respondent may apply for reinstatement at the end of that period. He will be eligible for readmission if he is able to establish that rehabilitation has occurred and that he is prepared to honor the duties and responsibilities of the legal profession. *Standards, supra,* § 6.3.[5]

The respondent should be aware that some members of this court feel that the suspension should be for a longer period of time, in keeping with the criteria set forth in *People v. Klein, supra.*

■ Accordingly, the respondent, Stephen T. Susman, is suspended, assessed the cost of these proceedings in the amount of $899, and given the right to apply for reinstatement at such time, not less than six months from the announcement of this opinion, as he is able to present sufficient evidence of rehabilitation to justify reinstatement.

MR. JUSTICE PRINGLE does not participate.

---

[4] "The report and recommendation of the board is advisory only. The court may modify the findings and may increase or decrease the discipline recommended. Discipline increased: *The Florida Bar v. Beasley,* 351 S.2d 959 (1977); *Benton v. Alaska Bar Association,* 431 P.2d 146 (1967); *Gassman v. State Bar,* 553 P.2d 1147 (Cal. 1976). Discipline decreased: *Yokozeki v. State Bar,* 521 P.2d 858 (Cal. 1974); *State v. MacIntyre,* 164 N.W.2d 235 (Wis. 1969).

[5] "*6.3 Suspension — As Final DIscipline — Imposition.* The court has exclusive power to suspend a lawyer.

"Suspension should be imposed for a specified period not in excess of three years."