The PEOPLE of the State of Colorado, Complainant,

v.

William G. BERGE, Respondent Attorney.

No. 80SA195.

Supreme Court of Colorado, En Banc.

Nov. 24, 1980.

Linda Donnelly, Denver, for complainant.

William C. McClearn, Paul G. West, Ira C. Rothgerber, Jr., Denver, for respondent.

LOHR, Justice.

The respondent, William G. Berge, was the subject of proceedings before the Grievance Committee of this court based upon a formal complaint which charged that his conduct as an attorney created cause for discipline pursuant to Rule 241, C.R.C.P. Those proceedings resulted in a recommendation by the hearing committee that he receive a public censure. Upon review of that recommendation, the hearing panel revised the recommended discipline to a one–

year suspension from the practice of law. After reviewing the record, we conclude that cause for discipline has been established and that a ninety–day suspension from the practice of law is the appropriate discipline.

In the formal complaint the respondent was charged with violating Rule 241 B, C.R.C.P.,[1] and the Code of Professional Responsibility, including DR5–101, by reason of the following acts: (1) exerting undue influence upon a client in connection with preparation and execution of his will in which the respondent was named as a beneficiary, (2) failing to adopt appropriate safeguards to avoid undue influence and the appearance of impropriety with respect to the drafting and execution of that will, and (3) failing to deal candidly with heirs and potential beneficiaries while acting as attorney for the personal representative of his deceased client's estate.

We summarize the facts from the findings of fact, conclusions, and recommendations of the hearing committee. These facts were established by clear and convincing evidence in proceedings before that committee.

The respondent was licensed to practice law in Colorado on September 10, 1951. He represented Allen C. Stephenson in various matters from about 1958 until Stephenson's death on May 8, 1976. The services included preparing a will, serving as attorney for Stephenson's mother's estate, and representing Stephenson in various real property and business matters. Prior to 1958 the respondent had assisted one of his law partners in various matters on behalf of Stephenson, including a successful appeal challenging an order of distribution of property incident to Stephenson's divorce. *See Stephenson v. Stephenson*, 134 Colo. 96, 299 P.2d 1095 (1956).

The respondent prepared a will which Stephenson signed on February 3, 1967. That will contained bequests of $10 each to three aunts and an uncle, left art objects and travel mementos to the Denver Art Museum, and divided the residue two–thirds to the Denver Dumb Friends League (DFL) and one–third to Angel Memorial Animal Hospital. A bank was named as executor. The executor was directed to retain a member of the respondent's law firm to perform all legal services for probate of the estate as a condition to being appointed executor.

In June 1968 Stephenson told the respondent that he wished to make a new will. Stephenson brought a copy of the 1967 will to the respondent's office. On that copy Stephenson had penciled comments relating to the changes which he wished to make. One such change was the inclusion of a bequest of part of the estate residue to the respondent.

The respondent declined to prepare the new will because he was to be a beneficiary. He recommended two prominent Denver attorneys to Stephenson, but these suggestions were rejected. Stephenson asked if there was "somebody here" who could draft the will. The respondent suggested another attorney, Mr. Smith (a fictitious name), whom he described as an independent practitioner, and Stephenson agreed that Smith should prepare the will.

Smith rented office space from the respondent's law firm. All office expenses, including telephone, rent, and secretarial salaries, but excluding stationery, were shared on a proportional basis. The tele-

---

1. Rule 241 B, C.R.C.P., has been amended subsequent to 1968, when much of the relevant conduct of the respondent took place. Sections (2) and (4) of Rule 241 B contain the provisions of the present rule which are important to this proceeding. Rule 241 B(4), C.R.C.P., stating that lawyers are subject to discipline for violation of "the highest standards of honesty, justice or morality," has an exact counterpart in the 1968 form of the rule. Although no such 1968 counterpart existed for the present Rule 241 B(2) proscribing "[c]onduct that violates accepted rules or standards of legal ethics," it cannot be seriously questioned that the earlier rule prohibits such conduct. *See* 241, C.R.C.P., 1967 Perm.Supp., C.R.S. 1963. This is not a situation where changed standards have resulted in charges based on conduct which was not prohibited when it occurred. *See In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (concurring opinion of Mr. Justice White).

phone system also was shared, and the access to Smith's office was through the front door of the offices of the respondent's firm. Smith had a close relationship with members of the respondent's firm; they drank coffee together in the office daily.

After Stephenson agreed that Smith should prepare the will, the respondent called Smith over the office intercommunications system. The two met, out of Stephenson's presence, and the respondent told Smith that he had just learned that Stephenson wanted to make the respondent a beneficiary in his new will. The respondent asked Smith to prepare the will and he agreed.

Immediately thereafter, Stephenson met with Smith in the latter's office and, utilizing the marked–up copy of the 1967 will, a new will was drafted substantially in accordance with the marked–up copy. If any changes were made, they were only clarifications. Smith and Stephenson did not discuss Stephenson's family situation, the possible tax consequences of the proposed will, or any of the other factors which could have affected that document materially. Smith gave Stephenson no substantive advice. The conference took only ten to fifteen minutes.

The new will increased the specific bequests to Stephenson's aunts and uncle from $10 each to $100 each. The DFL, which in the 1967 will had been named as recipient of two–thirds of the residuary estate, was to receive a specific bequest of $25,000 under the new will. The Angel Memorial Animal Hospital was to receive nothing. The residuary estate then was divided fifty–three percent to Leon DuCharme and forty–seven percent to the respondent. A requirement similar to that found in the 1967 will with respect to naming the respondent or his firm as attorneys for the estate was included in the 1968 will. In addition, a clause was added specifying that, if any beneficiary should challenge a provision of the will, the legacy to that beneficiary would lapse and fall into the residuary estate. This clause did not appear in the 1967 will but appeared in handwritten or typed form on the marked–up copy used to draft the 1968 will. All changes were based upon the notes appearing on the copy of the 1967 will.

On June 27, 1968, three to five days after the first meeting with respect to the new will, Stephenson returned to execute the will. Smith was unable to find a third witness nearby, so he requested the respondent to act as a witness. In the presence of Stephenson, the respondent, and another witness, Smith read the provisions of the will relating to the respondent, and Stephenson executed the will.

Smith performed the work as a favor to the respondent. Although Smith considered Stephenson to be his client for the purpose of the will, Smith kept no client file on this matter and did not charge Stephenson for his services. The only times Smith saw Stephenson were in the two meetings during which the 1968 will was drafted and executed.

On May 8, 1976, Stephenson died in Hawaii, where he customarily spent the winter months during the later years of his life. On May 11, 1976, a petition for appointment of a special administrator in the Stephenson estate, signed by DuCharme as petitioner and naming the respondent as his attorney, was filed in Denver probate court. An order appointing DuCharme as special administrator and an acceptance of that appointment were signed and filed in probate court that same day.

On May 20, 1976, DuCharme and the respondent went to Hawaii and took possession of the decedent's stock certificates, an inventory of stocks and other personal property, a copy of the 1967 will,[2] and decedent's savings passbook reflecting a balance of

---

2. The record reflects that this copy was sent to DuCharme before he and the respondent went to Hawaii. It had been found in Stephenson's hospital room after his death. Although the hearing committee found that DuCharme obtained the will in Hawaii, the error is not material.

approximately $197,000.[3] The respondent noticed this balance. The handwritten inventory contained about 55 entries reflecting significant holdings in such corporations as Texaco, Inc., and Pepsi Cola. The value of such stocks, as later reported in the inventory filed with the probate court, was $280,794.68. Also found among Stephenson's effects was a handwritten note requesting that the respondent and another be notified in case of accident or serious illness. Stapled to the note was the respondent's business card with a handwritten notation, "My attorney. Please notify in case of accident or serious injury."

Upon returning to Denver, DuCharme and the respondent went through Stephenson's home. Although they were unable to find the original 1968 will, they did locate a copy of that will in a file cabinet in the home.

On June 18, 1976, a petition for formal probate of the will and formal appointment of a personal representative was filed in the Denver probate court by the respondent as attorney for the bank which had been named as personal representative in the will. A copy of the 1968 will was attached. As part of the petition for formal probate, a paragraph was attached explaining where and when the copy had been found and stating that a search had been made in an unsuccessful effort to locate the original will.

The respondent sent a notice of hearing on the petition for formal probate to the devisees and heirs. The notice was accompanied by the petition for formal probate and by the respondent's letter dated June 22, 1976, containing the following underlined statement: *"It is not necessary for you to be present at that time* [the time of presentation of the will for probate] *in order to receive the bequest which was left to you under the terms of the Will."* The

notice was not accompanied by a copy of the will or any information as to the size of the bequests.

A representative of the DFL learned of Stephenson's death and had heard that Stephenson had named the DFL as the recipient of a substantial bequest. The DFL representative met with the respondent on June 24, 1976, to request information about the bequest. When told that it was $25,000, the representative expressed surprise, stating that it was her understanding that the DFL was to receive either one–third or two–thirds of an estate of approximately $400,000. The respondent told the DFL representative that the size of the estate was more like $250,000. The representative requested, and was shown, a copy of the will. She asked where the money was going and was told that Stephenson didn't have much and that the respondent and another man were getting some.[4] As it developed, the gross estate was $593,786 as shown in the court records.

The DFL retained counsel to investigate the matter. Negotiations ensued, resulting in a stipulated settlement by which, after payment of $100 each to the three aunts and the uncle and distribution of pictures, art objects, and travel mementos to the Denver Art Museum, the residuary estate was to be divided one–third to the residuary devisees under the 1967 will (the DFL and Angel Memorial Animal Hospital) and two–thirds to the residuary devisees under the 1968 will (DuCharme and the respondent). The court approved the stipulation, and distribution was made on that basis. As a consequence of the settlement, the charities received $195,204 and DuCharme and the respondent received the gross amount of $390,409. After taxes and expenses the respondent received $113,681.

We agree with the conclusion of the Grievance Committee that the respondent's

---

3. Although not specifically noted in the findings of the hearing committee, the uncontroverted evidence was that this final balance was struck through and something else penciled in, raising a question whether it reflected the then current balance.

4. The hearing committee's findings do not expressly state that the respondent told the DFL representative that the respondent was receiving a bequest. However, the DFL representative so testified.

conduct in connection with the preparation and execution of Stephenson's 1968 will and in dealing with the heirs and beneficiaries in the administration of Stephenson's estate violated accepted rules or standards of legal ethics contrary to C.R.C.P. 241 B(2). The respondent's lack of candor in dealing with the heirs and beneficiaries also violated the highest standards of honesty, justice, and morality contrary to C.R.C.P. 241 B(4). Our review of the record satisfies us that the charge that the respondent exerted undue influence upon his client in connection with preparation and execution of his will has not been established by clear and convincing evidence.[5]

## I.

Although Ethical Consideration EC 5–5 had not been adopted when the relevant events took place, it simply makes explicit some long–accepted standards of legal ethics which are relevant here.[6] It provides, in pertinent part:

"If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is cognizant of all the circumstances. Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client."

The respondent's efforts to "urge" Stephenson to obtain disinterested advice were limited to suggesting two other attorneys. When Stephenson rejected those suggestions and asked whether "somebody here" could prepare the will, the respondent immediately suggested Smith.

The close relationship of the respondent and his firm with Smith is inconsistent with the appearance of independence. Much more importantly, the manner in which Smith handled this matter establishes that he was not independent in fact. His inquiry into the facts essential to proper representation was minimal. He did not inquire into Stephenson's family situation, the size of his estate, or any other facts essential to proper representation. He gave Stephenson no substantive advice, but acted only as a scrivener in making changes noted on a copy of an earlier will. One of these changes, which should have suggested discussion or advice, was the introduction of a new provision intended to nullify the bequest to any beneficiary who should challenge the will. He never billed Stephenson even though he had no expectation of becoming attorney for the estate. Smith candidly admitted that his services in the matter were performed as a favor to the respondent. From the record, Smith appears to be a competent, experienced attorney. The way he treated this matter testifies eloquently to the close relationship between the respondent and Smith and to Smith's lack of independence. We agree with the conclusion of the hearing committee that the respondent's conduct in referring Stephenson to Smith violated accepted rules or standards of legal ethics, contrary to Rule 241 B(2), C.R.C.P.

Although of lesser significance, we conclude that the respondent's election to act as a witness to the will also was inconsistent with his duty to dissociate himself from the preparation and execution of a will which named him as beneficiary of almost half of the residuary estate.

5. The hearing committee made no specific finding with respect to this charge.

6. Mr. Justice White's statement in his concurring opinion in *In re Ruffalo, supra*, in considering whether a charge of violation of ethical standards expressed in general terms comports with due process of law, is appropriate to all the charges in the instant case:

"Even when a disbarment standard is as unspecific as the one before us, members of a bar can be assumed to know that certain kinds of conduct, generally condemned by responsible men, will be grounds for disbarment. This class of conduct certainly includes the criminal offenses traditionally known as *malum in se*. It also includes conduct which all responsible attorneys would recognize as improper for a member of the profession."

*In re Ruffalo*, 390 U.S. 544, 555, 88 S.Ct. 1222, 1228, 20 L.Ed.2d 117, 125 (1968).

## II.

We conclude that the respondent's conduct in dealing with Stephenson's heirs and with the DFL violated Rule 241 B(2) and (4), C.R.C.P.

The respondent's financial interests as beneficiary of a very substantial bequest and as attorney for the personal representative greatly increased the importance of dealing with the beneficiaries candidly. Lack of candor under such circumstances does not comport with either accepted standards of legal ethics or the highest standards of honesty, justice, and morality.

### A.

No original will had been found. The respondent was the beneficiary of a large bequest in the copy of the will submitted for probate. The estate was very substantial. The bequests to the heirs were minimal. The form of notice advised the beneficiaries that the original will had not been found. It did identify the beneficiaries, but not the amounts of the bequests. All of the heirs lived outside Colorado. The respondent chose to supplement the notice with a cover letter. In that letter he disclosed none of the facts which might have caused the heirs to realize that a large estate was at stake and that their own bequests were minimal. However, the respondent did include and underline a sentence which would have the logical effect of reducing the possibility that the heirs might inquire and question the probate of the will. That sentence, quoted earlier, told each heir that she need not appear in order to receive the bequest left to her under the terms of the will. Characterizing this conduct most favorably to the respondent, it lacks candor. Under the facts of the instant case, this conduct is at odds with accepted standards of legal ethics and with the highest standards of honesty, justice, and morality.

### B.

The respondent also failed to satisfy his duty of candor with respect to the inquiry of the DFL about the bequest to that organization. He estimated the size of the estate to be less than half the amount it developed to be. Even though the size of the estate had not been definitely established when the respondent met with the representative of the DFL, he had seen a stock inventory and savings passbook in Hawaii which gave him a basis to make a more accurate estimate of the size of the estate. The conclusion of the hearing committee that the respondent failed to deal candidly with the DFL is supported by clear and convincing evidence. Under the circumstances of this case, that failure also was contrary to the respondent's obligations under Rule 241 B(2) and (4), C.R.C.P.

## III.

The hearing panel of the Grievance Committee has recommended that the respondent be suspended from the practice of law for a period of twelve months and that he be assessed the costs of the proceedings. The recommendations of the Grievance Committee are advisory only; it is our duty to review those recommendations and to increase or decrease the recommended sanction in a proper case. *People v. Susman,* 196 Colo. 458, 587 P.2d 782 (1978). *See* A.B.A. Standards for Lawyer Disciplinary and Disability Proceedings § 2.1. In performing that duty we must consider the facts, circumstances, and background of the individual lawyer. *People v. Susman, supra.*

Standard 7.1 of the A.B.A. Standards for Lawyer Disciplinary and Disability Proceedings provides:

"*Factors to be Considered.* The discipline to be imposed should depend upon the specific facts and circumstances of the case, should be fashioned in light of the purpose of lawyer discipline, and may take into account aggravating or mitigating circumstances."

As stated in the Commentary to that standard:

"In determining the nature and extent of the discipline the court should consider '(a) the seriousness and circumstances of the offense, (b) avoidance of repetition,

(c) deterrent effect upon others, (d) maintenance of respect for the honor and dignity of the legal profession, and (e) assurance that those who seek legal service will be insulated from unprofessional conduct.' *In re Smith*, 83 Wash.2d 659, 521 P.2d 212, 215 (1974); *Office of Disciplinary Counsel v. Leopold*, 469 Pa. 384, 366 A.2d 227 (1976)."

The purpose of lawyer discipline is described in Standard 1.1 of the A.B.A. Standards of Lawyer Disciplinary and Disability Proceedings as follows:

> "The purpose of lawyer discipline and disability proceedings is to maintain appropriate standards of professional conduct in order to protect the public and the administration of justice from lawyers who have demonstrated by their conduct that they are unable or are likely to be unable to properly discharge their professional duties."

Although the conduct of the respondent was seriously at variance with his ethical obligations as a lawyer and was of a type which tends to bring the legal profession into disrepute with the public, our review of the record discloses no evidence that the distribution of assets directed in the 1968 will did not reflect the testator's true testamentary intent. We also take into account that the record reflects no prior disciplinary action against the respondent in almost thirty years of practice of law in the state of Colorado.[7]

After weighing the relevant considerations, we conclude that a ninety–day suspension from the practice of law is the appropriate discipline and now order such suspension, beginning on the date of issuance of this opinion. In addition, the respondent shall pay the costs of $533.32 to the clerk of this court within sixty days.

ERICKSON and ROVIRA, JJ., do not participate.

---

7. We have considered the respondent's exception to the findings of fact, conclusions, and recommendations of the hearing committee. We find all of those exceptions to be without merit, including those not addressed specifically in this opinion.